Good morning. May it please the Court, I'm Marcia Moutry representing the City of Santa Monica. The City is here this morning to ask that you dissolve the injunction that was issued by the District Court and allow the City's ordinance regulating usage of the Santa Monica Airport to go into effect. Can I ask you a practical question? Why can't you wait until, I guess it's about 90 days or less, before there's actually the completion of the administrative proceeding? Why is there such a desire to put this into effect after you were essentially doing nothing for about, between 2002 and 2008? You were either doing nothing or you were negotiating with the FAA or the discussions were in limbo and now all of a sudden we have to decide this without the benefit of a complete administrative record. And I was just wondering why the rush, particularly since the only accidents that have ever occurred at the airport have not involved the Class C and Class D aircraft. I have several points I'd like to make in response, Your Honor. It is anticipated at present that the administrative proceeding that's now pending will conclude this summer. The hearing will take place in March. I understand that is only a difference of perhaps 90 additional days from when you said, but I wanted to let you know that the hearing is now scheduled for March. Was it initially scheduled earlier? I'm not sure where I was. Yes, it was, Your Honor, and has been postponed until March. And then, as you know, that's sort of the second step. At whose instance? I'm sorry? At whose instance was it postponed? The hearing examiner suggested that the parties go through further mediation in front of an FAA mediator, and both parties agreed to do that at his request. But I still don't know why the rush. I was coming to that, Your Honor. I think there's several responses to that question. Circumstances first. Circumstances have continued to change during the course of this very long-running dispute, and Your Honor is correct, it is a long dispute. CMD traffic at the Santa Monica Airport has increased by about, I think it's 32 percent, since the proceedings began in 2001 and 2002. And so the number of faster airplanes using our airport has gone up during the course of the dispute. You are correct that the two overruns that have occurred during the course of this dispute have both been Category B aircraft. Prop planes. I'm sorry? Prop planes. Prop planes. Actually, I believe they were both props. So the reason I'm hesitating, Your Honor, is that Category B aircraft also include jets. Contrary to the suggestion in the federal government's briefs, we aren't banning jets. Half the jets that use the airport would continue to be welcome there under the ordinance that we want. As I recall, when I was on the district court, I presided over a crash. Two prop planes collided at Santa Monica Airport. Yes, that was some while ago. What? That was a while ago, that did happen. Our ordinance wouldn't protect against it. Wasn't that a case involving a lawyer named Rudelson? Yes, I believe that's right. I believe that's right. It was a long time ago. Not when you're 85 years old. Not a long time ago. From 61, it seems like a long time ago. At any rate, that particular danger, the danger of aircraft crashing in the air, would not be averted by this ordinance. This ordinance protects against overruns. So the number of faster planes has increased. You're right that the two overruns that have occurred in the last six years involved Category B, slower approach aircraft, and it's a good thing they did. I think at that time they were operating under this visual flight rules. There have been improvements. Yes. Changes in the fleet and improvements. And the federal government has put some money in there, too. Not since 1994, but yes. Not since 1994. The city no longer accepts federal grants, and the last one was in 1994. They've offered you money, haven't they, to try and make the airport safer and deal with your concerns. As I understand it, they offered money to buy additional land and areas where there is some housing which would have enabled you to make, which would have attempted to address your concerns. Well, it might have. The city is the airport proprietor and protector of neighborhood safety doesn't want to buy up the Sunset Park neighborhood to build runway protections. So you are correct that they would fund that. We're talking about, I don't know, I can't be sure, about 600 to 700 feet, but you still really haven't answered my question. Maybe there's been a big change between 2002 and 2008, but you weren't doing anything in 2007 and 2006, and why shouldn't we have the benefit of a complete administrative record? Why are you now so insistent on pressing these proceedings before we have a complete administrative record? The city council decided in 2002 in a public statement that... And the matter is now before an arbitrator, you know. It's before a mediator now, that's correct. A mediator, okay. That's correct, Your Honor. A mediator. Right. And, you know, it's the policy of the law to encourage mediation. Absolutely, and we're participating voluntarily. Why don't you just wait? You know, things take time. We don't know when the accident's going to occur. I... Well, you know, you've never had an accident with these, except for these prop planes. But the same planes that use our airports, the very same individual planes, have overrun airport runways in other cities. We know that this is a risk. But you've never had one in San Marcos. We've had two overruns, and they were both these. Probably what they're thinking about is eliminating the airport entirely, right? I'm sorry, sir? Probably want to eliminate the airport entirely. I don't know what a future city council will do, and that will be within their power. It's logical because then they can build houses there. Oh, no, I don't know about that. Sir, I'll tell you that I believe the city council in 2015, if they have that option, is much more likely to eliminate the airport if they can't make it safe because they would be silly to ignore the risk. Well, safety is a relative concept. Yes, sir. I've read that Los Angeles Airport is not as safe as it could be because of the maneuvers that the pilots have to make in order to comply with noise ordinances so that essentially I'm more nervous when I fly into Los Angeles Airport than I might be elsewhere. So we're talking about as safe as practical, meeting certain minimum standards of safety. Yes, of course. Now, as I understand it, these C and D planes don't all land at their maximum speed, that this classification is what would happen if they were full and landed, you know, depended on the weight, and they all landed at maximum speed, but that the FAA has various operational regulations that regulate the circumstances under which the planes can land so that there isn't just sort of, you know, a pile of dust doesn't go blasting in there, let's say, at 141, what is it, knots or miles per hour. So there is safety regulation beyond what would be at the end of the runway. There is safety regulation, Your Honor. You're correct. What the city wants to do is implement the runway safety area standards, which are 1,000 feet for those aircraft. We have none, and we have homes within 300 feet of the runway ends. So while you are correct that safety, including safety at airports, is relative, we're not aware of another airport in the country that has homes within 300 feet of a runway and below, 40 feet below the runway ends, and has no safety areas. May I run a scenario by you? I'm going to run the same one by Ms. Klein when she steps up. It seems to me the heart of what you're saying is that the district court should have applied normal standards for preliminary injunctive relief instead of what I would by shorthand refer to as enforcement proceeding standard, which in some other agency schemes means you just eyeball it and see if there's a crime of facial showing, and it appears to be okay, and you grant the enforcement. So if that's true, the agency here went in to seek enforcement. The district court would have erred in applying an enforcement standard rather than a normal preliminary injunction standard as spun by the U.S. Supreme Court last week. Okay, so you have appealed the grant of preliminary injunction. Yes. If we were to agree with you that the normal preliminary injunction standard should apply, then why shouldn't we look at the record and make a call as to whether the record as it existed before the court shows a likelihood of success and weigh it against the public interest values and affirm on that basis because it's a status quo injunction, which is Judge Corman's point. It doesn't do diddly squat to Santa Monica in the meantime. It's just a simple status quo injunction. If we did that, then we would then dismiss the petition for review, which is coming directly from the interim relief cease and desist order, as moved. Yes, you certainly have the option of treating this as an application for a preliminary injunction and ruling on it yourselves. As you would anticipate, I don't know. Well, you disagree with the merits. I do. But the basic scenario, you think, is that? I think that's one of your options procedurally. I definitely agree with that. I would point out that under this Court's ruling in Golden Gate, it's not clear to me that this is a pure status quo injunction request. I think it's arguable that the Santa Monica City Council established a new status quo when it adopted the ordinance. Well, that's the problem. That's what changed the status quo was adopting the ordinance. Come on. That's just normal injunction fare. I mean, somebody takes action, you get it back to ground zero. I'm not sure it's somebody taking it. I'm not sure the council – of course, I'm your lawyer, but I'm not sure it's merely somebody. We're quibbling on the merits of the injunctive relief. So let me just clarify that you don't have any procedural problems with the scenario I laid out. If you're approaching the case that way, no, Your Honor, I think that's one of your options. We think the easiest way for you to approach the case is just to decide that the orders were issued ultra vires because the agency did not follow the federal law, which requires hearing. That's the whole point of my scenario. The agency chose to go into court. So it doesn't make any real, substantive, meaningful difference whether it did so without having issued a cease and desist order on an interim basis or not. It went into court. It asked for injunctive relief. We can say, okay, fine, it went in there. Whether or not it should have issued a cease and desist order, it can go into court and ask for an injunction. It applied an injunction standard, and I would carry it forward and say, no reason why an injunction shouldn't exist for the next four or five months. I don't disagree. You have that. You can convert it. I agree with you completely about that. And maybe you ought to say why you disagree with me that the record does not indicate that the injunctive relief that was granted is proper under a normal preliminary injunction standard. I'd be glad to. I'd be glad to because I think you're required to look at the balance of the harms and at the public welfare in this case. The harm alleged by the federal government in this case is that certain aircraft would not be able to land at the airport for the next, in the case you're talking about, perhaps six months, or indefinitely depending on what happens afterwards. We don't think that that compares in any way to the risk that is being borne by the neighbor in the city. For 20 years, this has been the pattern. Nothing has happened with respect to C&D class aircraft. So, of course, there's a risk. There's a risk every time an airplane lifts off the ground or tries to come back. But the record shows no incident in the last 20 years. The record shows that there would be disruption at some level to air transport in the Los Angeles basin by diverting 25 flights a day or 9,000 annually, roughly on your figures, to some other airport in the basin. And the public interest would favor the agency's position that for this limited period of time, you should cool it until the agency proceeding is finished. I have two points I'd like to make in response, Your Honor. The citation in the federal government's brief, which is to page 27 of the excerpt of the record, is a cite to their own determination. It is true that flights would be displaced. And you quoted the numbers, which I believe to be correct. But what's completely lacking in the record is any evidence that that would actually disrupt the transportation grid. The city has evidence in the record that numbers at Van Nuys are down, that Hawthorne wants our airplanes, that people, about 40 percent of C&D travelers at Santa Monica are fractional share owners.  It means they bought a right to use part of a private jet, Your Honor. And companies that sell fractional shares allow their customers the opportunity to trade down. So the same people could use the same rights with the same company and come into our airport on B aircraft as well. So we don't believe that the federal government has actually submitted any evidence of a disruption to the grid. All that there is from their standpoint is evidence that, yes, some people might have to land elsewhere if they choose to use C&D aircraft. And as to the other point I wanted to make, Your Honor, as to both of your questions about why worry. There hasn't been an accident in 20 years. I've only appeared in this court a few times, but I've followed your work for my whole career. I'm not aware of your having had a shooting or a bombing in this building, but I came through a metal detector when I came in, of course, because you know that dangerous things have happened elsewhere, that people have been hurt in courthouses. Overruns occur all the time. Last month there was a fatal overrun by the same kind of a plane, a Learjet, that uses Santa Monica in South Carolina. Four people died in a fire. They happen every month somewhere. We don't know when the accident will happen here, but there are federal safety standards that we are not meeting. In the event of an overrun, and again, we don't know when that would happen, but in the event of an overrun, the city will be held liable. Now, the city's liability isn't my primary concern here this morning. It's safety, but I was... Well, but maybe they would be held liable because they've chosen not to take other avenues that were open to them to make it safer. You mean like buying up the houses in the neighborhood? Yeah. Well, the neighborhood... And I believe the FAA has offered other alternatives. I forget the acronym for it.  EMAS. Yeah, which operates, I guess, to slow the aircraft. Yes, it does. You don't want that either. You've rejected that on the grounds that it's not feasible. So the FAA seems to me to be trying to work with you, recognizing there's some merit to your position. And as we have tried to work with them, Your Honor. Well, if you're in such a hurry, why did you agree to mediate? My general approach to my work, Your Honor, would be if a hearing examiner suggested we mediate, I would counsel my client to mediate. I think it's just good sense. We're the government. We try to be fair and reasonable, and so I think it was the right thing to do. I think telling a hearing examiner that you're refusing his or her suggestion to mediate is, along with being actually unreasonable, certainly appears to be unreasonable. Well, you could have said we've been working with them for eight years or six years, whatever it is, and we have been unsuccessful and now we can't sleep over the possibility that tomorrow an airplane is going to crash and we don't want to agree to this. Your Honor, I don't think we should be faulted for working with the FAA. I'm not faulting you at all. I'm just trying to get to the reason why we should operate under the scheme that you want us to follow here, that's all. The procedural scheme that you want us to follow. All we want to do is effectuate the ordinance that we believe will protect the safety of the neighborhood. You are right that the negotiations went on for a long time before the council adopted the ordinance. I could never disagree with that. I think we all know the sensation of getting to the end of the rope. We worked for years, and it was unavailing. Finally, the city council said the number of C&D aircraft is increasing. We've got to protect neighborhood safety. Every time there's an overrun somewhere in the country, we hear about it. We've come to the end of our rope. The proceeding has already begun. They served you with an NOI, and you responded, and you should have said, okay, we've reached the end of our rope. Let's go. Let's complete this process, and we'll have a complete administrative record. Actually, Your Honor, it was the FAA that had a time limit. They had a 120-day time limit for a decision which they didn't follow. I know you make that argument, but on the other hand, they were trying. The argument that you're making is really they were trying to negotiate with you. That's what was happening. You were essentially enabling them by not pressing the 120 days because you were involved in negotiations with them. It seems to me you sort of can't have it both ways. Here they are. There's a 120-day limit, and they say we're willing to work with you to try and resolve the problem. You start working with them. You're, in effect, sort of consenting to this delay. Well, I don't believe it would have been the city council's intent to consent or to appear to you to have consented. We worked with them, and it appeared finally that that was unavailing. The council conducted three public hearings, two at the airport commission. We had a full and complete process. Our change of direction, if you will, Your Honor, didn't come as a surprise to anyone. I think the council, as the proprietor of the airport, has a federal right to protect the neighborhood and to decide what aircraft can use or not use the airport so long as that decision is reasonably based and consistent with constitutional protections, the Commerce Clause and so on. I think the council exercised a power which it clearly holds, and I don't think that my client should be faulted for having negotiated with the federal government. Okay. Can I ask you a question? Oh, yeah, sure. I just wanted to ask you a question about the finality of the cease and desist order. Is this the definitive statement? Normally, even a motion for a preliminary injunction would not be regarded from the district court as a final order. That would be appealable. Yes, I know. The reason it's appealable is because Congress has enacted a statute to create an exception to the final order. Is this the definitive statement of the FAA on this issue, or is it simply trying to maintain the status quo until it makes a definitive judgment about the issue? Well, they will make a final decision following the hearing and the appeal to the administrator. But doesn't our ability to review the cease and desist order, which you're seeking here, doesn't that require a final order? Well, it's a difficult question to answer because to put it in, I'm sorry, this is on simple-minded terms, there's no such thing as an interim cease and desist order. So it's difficult for me to answer for you how federal law classifies it, since the agency is not authorized to issue this type of emergency order unless there is a safety emergency. What about through their grant authority? There are sort of three statutes that authorize orders, and one of them is based on the fact that you've received money from them and entered into an agreement with them. And that doesn't require them to hold a hearing before issuing an order. Well, but our position, as we argued in our briefs, is that's a generic authorization, and it is trumped by the specific requirement that before they issue a compliance order, they conduct a hearing. But I think all that really is taken care of by Drimer's point, which is if you wish to convert this into what amounts to a preliminary injunction application, then it doesn't, you are right, Your Honor, that it doesn't matter if they conducted the hearing or not. I can't, I wish I could argue that, but I can't. I believe that's correct. All right. Thank you. Thank you. May it please the Court, Elisa Klein for the FAA. I'll start with Judge Rimer's question, which we're largely agreeing with you, Judge Rimer. If the Court wanted to reserve the issue of whether this was an enforcement proceeding and simply hold that it would have been an abuse of discretion to deny a preliminary injunction, even under ordinary standards, that would certainly be within the Court's prerogatives. And we're not objecting to that, but I want to make clear that we were correct, that the FAA could issue an order and that this was properly, if the district were concluded, just an enforcement action. Well, it's not so crystal clear that you're correct. I mean, the statute doesn't provide any explicit authority, so it's got to be inferred from the general authority to the secretary or the administrator to issue orders. Other, some other police agency statutory schemes are quite explicit in giving the agency the authority to issue cease and desist orders on an interim basis to seek injunctive relief in a court, specify the standards and whatever. And I can read this statute, and probably do read it, as saying you can go in for an enforcement when you've done a violation and you've issued an order after a final determination and the person at the other end of the order thumbs his nose at the agency, so you go into district court and enforce it. I mean, that's a plausible reading of a statutory scheme, and so my suggestion is that one can avoid all that difficulty by simply saying, well, look, you all opted to go into court to get a preliminary injunction, so treat it that way. Well, again, I'm not disagreeing if the court is reserving the issue, but just taking a step back just to the common sense way this scheme operates, this is the National Aviation System, and the decisions made by individual airports affect everything. And so the way, if an airport wants to make a change, here's the way it's supposed to work. For example, Van Nuys and Burbank both want to make changes to airport operations, largely based on noise. Burbank wants the type of night curfew that Santa Monica has had since the early 1980s. Van Nuys wants to impose restrictions. These are discussed in the director's determination. And so they're preparing to petition the FAA to say, we want to make a change. They are not about to impose this unilaterally. Under the city's view, any airport in a country could simply say, we are banning operations, and, you know, we think in good faith that we're justified, but we're doing it right away, and there is no power in the FAA to issue an order that says stop. I understand your earnest point. The FAA could go to court and ‑‑ Which is what it did. I guess what I'm just suggesting is I'm not sure I much care whether you issued an order internally or not, because what you did was to go into court to get it ‑‑ have teeth. That's how you get teeth into any order that the agency issues, right, because you don't have U.S. Marshals or anything else out there. I mean, you go get your teeth from going into court. So the question then to me is, what standard is applied properly once you go into court? Yes, and it matters. First, just to clarify, Congress has provided that FAA orders are effective on their own terms. And the way ‑‑ I appreciate we don't have marshals, we can't arrest anyone, but the way this ‑‑ what should have happened was not an enforcement action. There could have been an emergency request for relief from this court. I'll turn to jurisdiction. An emergency request, this court is empowered to issue interim relief. Procedurally, this court has the direct review authority, and that's the way if the city was dissatisfied with the order. But you jumped into federal court, not the city. That's what I'm saying. It was the agency's option to go into federal court to seek the equitable relief. Well, we had to because the city indicated it was going to refuse to comply with the FAA orders. But now, again, the FAA, going back to the reason, there's no question that the FAA's ultimate determination will receive substantial deference when it's reviewed in this court. And as the Tenth Circuit explained in Arapaho, it's for all the obvious reasons such as the agency's expertise. And here, too, Congress did not set up a scheme where a district court decides de novo under ordinary preliminary injunction standards whether the harm of an immediate change to the status quo is overridden. It's not that kind of a scheme. The FAA decides in its order, and it explains, well, this is going to divert operations to other already overcrowded airports. All of these raise safety concerns. There's no dichotomy between safety and convenience. It will have an immediate impact on all of these operators. And on the other hand, nothing has happened that warrants this type of immediate change to the status quo while the ordinance is under review by the agency. Which means you win. Yes, Your Honor. Again, I'm not fighting if the court wants to say it would have been an abusive discretion under these circumstances to deny a preliminary injunction, because it clearly would have been. I'm just asking that the court understand that when Congress gave the FAA broad authority to issue orders, it considers necessary to carry out its mandates, and that's both its general aviation safety mandates. But, you know, what you're doing is you're displaying your expertise. Well, the FAA certainly has the relevant expertise. But you are as well. So, you know, you're just talking at cross purposes. We're all on the same line, you know. You've already used up half your time. I just want to make sure Judge Reimer is satisfied with my concerns here, which is that If I'm hearing what you're saying, is that in your view, once an order of any sort is issued prior to a final determination, that puts the monkey on the back of the airport to come to this court to seek relief from the interim order. That's exactly right. And you can understand why the FAA may have to issue orders in all sorts of circumstances. It's not even just about airports. Oh, yeah, sure, but you've got clear authority to do so on the safety side. Well, the fact that it's not a safety emergency doesn't mean it doesn't implicate safety. Another example, the director... It's not an emergency. I mean, this isn't an emergency. I mean, it wasn't presented in the district court that way, nor is it presented that way here. Not in the narrow sense, but in the city's view, LAX could shut down all operations tomorrow. It doesn't mean planes will fall from the sky, but it certainly would require urgent action. That's why Van Nuys and Burbank know that they need to come to the FAA first. They don't just impose their restrictions because it would have consequences for Santa Monica and LAX. This is one of the most crowded regions in the country. So it may not be an aviation emergency in the narrow sense, but all of these considerations affect safety, and the FAA is statutorily charged with looking at the whole system and thinking things like, okay, if Category C and D operators, let's assume they switch to B, Category B planes have to refuel more than Category C. That means an extra landing somewhere at some other airport. It changes the flight path, and all of this... I'm not making this up. This is all in the director's determination. All of these considerations are for the FAA to make in the first instance, and that's why this was properly issued as an FAA interim cease and desist order, just to preserve the status quo. There's no, as Judge Corman was querying... You've never done that before in a non-emergency situation? This has never happened before. The airports know they have to go to the FAA before they can make a change that affects operations. That's why Van Nuys and Burbank aren't just imposing their restrictions. They are preparing a petition in which they want to try to substantiate to the FAA as the party that wants to make the change that they have a good reason to impose restrictions, and then the FAA's decisions get reviewed in the Court of Appeals with its deferential review. But that's the process. Santa Monica, as far as we know, stands alone in unilaterally making a change that affects aircraft operations over the FAA's objections. Sometimes the FAA will be approached and will say fine, and sometimes then there's a private complaint and the FAA will adjudicate it. But I think the first cease and desist order explained that this action is unprecedented by an airport. Sorry to keep... Let me ask you, on your view, which is that what should have happened is that the airport should have come here for a review of the interim cease and desist order, what standard would we apply to that review on your take? It's not that different from the standard that's applicable if there were a district court preliminary injunction. So essentially was there a clear error in judgment, in this case it's by the agency, but it could have been by a court, in deciding that there was no justification to change the status quo during the administrative process. So it would be basically, basically the same. Yes, yes. There are different formulations that are used, but as a practical matter, there could be an eyeballing of the merits, but it's largely review of the balance of the harms. And just so I don't forget jurisdiction, that's a hard question and there's not much law on it. We treated it as final for purposes of jurisdiction because it has an immediate practical effect, but even if it were not final under the case involving Oregon, the Public Utility Commissioner of Oregon that we cited in our brief, this court would at a minimum have the mandamus jurisdiction. It's another quick look because there is an immediate effect. And so whether it's regarded, we think probably it's a final order within the square terms of the direct review provision, or as ancillary to direct review under mandamus, which is that's how this court and the DC Circuit, all the courts, would treat any preliminary request for relief goes to the direct review court. Unless the court has further questions, I'll rest in our brief. I wanted to respond just very briefly to two points counsel made. She said that if all, she suggested that if all airport proprietors acted like Santa Monica did, that the system could kind of come crashing down. But I think the key word is proprietors. Congress has recognized that airport proprietors have special rights to control usage of their airports so that they can protect neighbors and shield themselves from liability. I mean, you can do it as far as sound restrictions are concerned and matters such as that. Could you just close down the airport? No. No, we're contractually obligated to operate it until 2015, so it wouldn't arise in the context of a proprietor's right. It's a contractual obligation. I remember you saying you can't do it in a final sense. It's only a question of whether you have to do it this minute. And what your adversary is saying is this just doesn't happen. People or airports, when they want to make changes, they come to us, and we start the administrative procedure rolling, and it just doesn't happen. Did you decide one day that the city council, I suspect it was, from what we can tell, there was an accident in January of 2008. There was an accident. Not involving C&D. That's correct. All of a sudden, the elected members of the city council decided that they ought to do something after all this time. I suspect that's really what happened here. But you just make an announcement, and then you change traffic patterns. We didn't just make an announcement. There were five public hearings, and we may have been too sluggish from what you said earlier, Your Honor. So it wasn't an impulsive action on the city's part. So the proprietor's exception is very important, I think. And as to the extent of that exception, if it matters in your consideration. Why didn't Santa Monica just follow the same procedures that Van Nuys follows? We've worked with the FAA on various issues at the same time and over the same time period that we were working on this particular issue, and we haven't ignored the FAA. They've been part of our lives almost daily in my office for the last six years. So we have worked with the FAA. Candidly, we haven't been able to come to an agreement that we feel protects the city adequately under the FAA's own standards. We have not been unreasonable with them, nor have we ignored them. But at this point, the council has made a legislative judgment that would effectuate federal standards. And, of course, it's my job to convince them. at least for the moment, that it's not unsafe. Yes, that is apparently what they've decided, though they haven't decided that pursuant to any process, which, to get to my second point, would warrant the kind of deference on review that opposing council has argued for. There's been no hearing. So I think that they would not be, for issuing an interim order without a hearing, I don't think that their ruling that amounts to an injunctive order is entitled to deference in this court. Thank you very much.
judges: Pregerson, Rymer, Korman